Filed 12/12/23  P. v. Miller CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICHARD MILLER,<br><br>        Defendant and Appellant. | A166303<br><br>(Solano County<br>Super. Ct. No.<br>VCR186579) |

Defendant Richard Miller appeals from a postjudgment order denying his second petition for resentencing under Penal Code former section 1170.95[1] (now § 1172.6).  The trial court rejected his request to appoint counsel and ruled defendant failed to make a prima facie case for relief, stating the petition "does not cite new legal authority which undermines the basis of the denial of the previous petition" (the basis of the previous denial being findings after an evidentiary hearing that defendant was a major participant in the underlying crimes and acted with reckless indifference to human life).

Defendant maintains he was entitled to appointment of counsel because (1) his petition was "facially sufficient" and (2) he did cite "new legal

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

authority" that undermines the court's prior finding that he acted with reckless indifference to human life. We conclude defendant did cite "new legal authority" that pertains to the court's prior finding that defendant acted with reckless indifference to human life and therefore reverse and remand for further proceedings.

## BACKGROUND

In 2008, defendant pleaded no contest to second degree murder and robbery, and the trial court sentenced him to 20 years to life.

In March 2019, defendant filed a petition for resentencing under former section 1170.95, now section 1172.6. The trial court appointed counsel, ruled defendant made a prima facie showing of entitlement to resentencing, and held an evidentiary hearing at which several witnesses, including defendant's co-perpetrators testified. After additional briefing by the parties, the court denied the petition. The court determined defendant was ineligible for relief because he was a major participant in the crimes and acted with reckless indifference to human life. Defendant appealed, and this court affirmed the trial court's ruling in *People v. Miller* (Jan. 29, 2021, A159345) [nonpub. opn.].

In May 2022, defendant filed a second petition for resentencing. The trial court did not appoint counsel and ruled defendant failed to make a prima facie case, stating the petition "does not cite new legal authority which undermines the basis of the denial of the previous petition."

## DISCUSSION

"Effective January 1, 2019, Senate Bill [No.] 1437 [(2017–2018 Reg. Sess.)] amended murder liability under the felony-murder and natural and probable consequences theories. The bill redefined malice under section 188 to require that the principal acted with malice aforethought. Now, '[m]alice

2

shall not be imputed to a person based solely on his or her participation in a crime.' (§ 188, subd. (a)(3).)" (*People v. Turner* (2020) 45 Cal.App.5th 428, 433; *People v. Gentile* (2020) 10 Cal.5th 830, 842, abrogated by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.) The bill also amended section 189 to provide that a defendant who was not the actual killer and did not have intent to kill is not liable for felony murder unless the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e); Stats. 2018, ch. 1015, § 1, subd. (f); *Gentile*, at pp. 842–843.) In addition, Senate Bill No. 1437 "added section 1170.95[, now section 1172.6,] to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief" under sections 188 and 189. (*Gentile*, at p. 843.)

To pursue relief, a petitioner "file[s] a petition with the court that sentenced petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." (§ 1172.6, subd. (a).) If, as it did with the first petition, the trial court concludes the petition states a prima facie case for relief and issues an order to show cause, the court must then "hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the

3

changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

After the enactment of former section 1170.95, the Legislature passed "Senate Bill No. 775 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 551)," which "codified and clarified *People v. Lewis* (2021) 11 Cal.5th 952, 961–972 . . . (*Lewis*), reaffirmed that beyond a reasonable doubt is the proper burden of proof . . . [at a] . . . resentencing hearing," provided that the Rules of Evidence apply to evidentiary hearings held pursuant to the statute, "and expanded former section 1170.95's provisions to apply also to persons convicted of attempted murder or manslaughter. (Sen. Bill [No.] 775, § 1, subds. (a)–(d).)" (*People v. Delgadillo* (2022) 14 Cal.5th 216, 223, fn. 3 (*Delgadillo*).) With the passage of Assembly Bill No. 200 (2021–2022 Reg. Sess.), the Legislature renumbered former section 1170.95 to section 1172.6 without further substantive change. (*Ibid.*)

### *Appointment of Counsel*

Under section 1172.6, an offender must file a petition in the sentencing court averring that: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been

4

convicted of murder or attempted murder[;] [¶] [and] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019.' " (§ 1172.6, subd. (a)(1)–(3); *Lewis, supra*, 11 Cal.5th at pp. 959–960 [outlining former § 1170.95, subd. (a)(1)–(3)].)  The petition must also include a declaration by the petitioner that these three requirements have been met, the superior court case number and year of petitioner's conviction, and an indication as to whether the petitioner requests counsel.  (§ 1172.6, subd. (b)(1)(A)–(C).)  If the requisite information is provided and the petitioner has requested counsel, the court must appoint counsel.  (§ 1172.6, subd. (b)(3).)[2]  The court must then review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section.  (§ 1172.6, subd. (c); *Lewis*, at p. 960.)

There is no dispute defendant filed a petition providing the requisite information and requesting appointment of counsel.  Accordingly, the trial court erred in failing to appoint counsel.  As our Supreme Court stated in *Lewis* (referring to former section 1170.95), "[W]hether a petitioner 'requests the appointment of counsel' is part of the information that must be included in a petition for it to satisfy section 1170.95, subdivision (b)(2) review. [Citations.]  Subdivision (c)'s language regarding the appointment of counsel is mandatory:  'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.'  (§ 1170.95, subd. (c), italics added.)  The combined meaning is clear: petitioners who file a complying

_____

[2]  This statutory provision states: "Upon receiving a petition in which the information required by this subdivision is set forth or a petition where any missing information can readily be ascertained by the court, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner."  (§ 1172.6, subd. (b)(3).)

5

petition requesting counsel are to receive counsel upon the filing of a compliant petition." (*Lewis, supra,* 11 Cal.5th at pp. 962–963.)

We therefore turn to whether the error in failing to appoint counsel was harmless.

***Harmless or Prejudicial Error***

The failure to appoint counsel under section 1172.6 is reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Lewis, supra,* 11 Cal.5th at pp. 957–958; *People v. Hurtado* (2023) 89 Cal.App.5th 887, 892.) Under that standard, defendant must show a reasonable probability that he would have obtained a more favorable result if the trial court had appointed counsel. (*Lewis,* at p. 974.) Specifically, "a petitioner 'whose petition is denied before an order to show cause issues has the burden of showing "it is reasonably probable that if [defendant] had been afforded assistance of counsel his . . . petition would not have been summarily denied without an evidentiary hearing." ' " (*Ibid.*)

The bar at the prima facie stage is " 'intentionally and correctly set very low.' " (*Lewis, supra,* 11 Cal.5th at p. 972.) But it is not nonexistent. The trial court may use the record of conviction to determine if the defendant is disqualified from relief under the statute as a matter of law. (*Id.* at pp. 970–971.) The prima facie review allows "the court to distinguish petitions with potential merit from those that are clearly meritless." (*Id.* at p. 971.) The court's review, however, "is limited to readily ascertainable facts from the record (such as the crime of conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion (such as determining whether the petitioner showed reckless indifference to human life in the commission of the crime)." (*People v. Drayton* (2020) 47 Cal.App.5th 965, 980, abrogated on other grounds in *Lewis,* at p. 963.)

6

The parties agree that successive petitions for resentencing are not barred where "the subsequent petition rest[s] on new legal authority which challenged the basis for the superior court's summary denial of the previous petition." (*People v. Farfan* (2021) 71 Cal.App.5th 942, 946–947.)

They disagree on whether any such "new legal authority" has been promulgated since the denial of defendant's prior petition. Defendant maintains "legal changes made by [Senate Bill No.] 775 [(2021–2022 Reg. Sess.)] and the publication of new case law related to youth in resentencing undermine the court's prior conclusions about [his] 'reckless indifference.'" (Capitalization & boldface omitted.) The Attorney General maintains that "[n]one of the changes made by Senate Bill No. 775 [(2021–2022 Reg. Sess.)], nor recent decisions regarding youthful offenders, undercut the superior court's reasoning in denying [defendant's] first petition."[3]

### *Testimony At Prior Evidentiary Hearing*

To provide context to the issue before us, we first summarize the evidence adduced during the evidentiary hearing on defendant's prior resentencing petition. The trial court heard testimony from defendant's co-perpetrators, one of the perpetrator's girlfriends, and a police officer who spoke to defendant the day after the shooting.

---

[3] We summarily reject the Attorney General's argument that any error in failing to appoint counsel was harmless because defendant's second petition is barred by the doctrines of collateral estoppel or law of the case. A change in the law is a well-recognized exception to these preclusion doctrines. Thus, if, as we shall conclude, there has been such a change, these doctrines do not apply. (See *People v. Strong* (2022) 13 Cal.5th 698, 716 (*Strong*) ["one well-settled equitable exception to the general rule holds that preclusion does not apply when there has been a significant change in the law since the factual findings were rendered that warrants reexamination of the issue"].)

Robert Thomas testified he, then 18-year-old defendant, and Michael Mackey made a plan to rob Tomas Gonzalez of a pound of marijuana. Two days before the murder, Thomas arranged with Gonzalez to make a purchase. The day before the murder, Thomas contacted defendant, told him about the robbery, and asked him to participate. Defendant agreed. Defendant asked if he should get a gun, and Thomas said he should.

On the day of the crime, Thomas picked up Mackey and defendant, and the three discussed how the robbery would take place. Defendant had obtained a firearm, which Thomas saw. Thomas was in communication with Gonzalez on where to meet. While they were in the car, waiting for Gonzalez, defendant gave the gun to Mackey. Thomas recalled Mackey stating he was " 'going to shoot him if anyone moves.' " Thomas replied, " '[I]f you shoot him, you going to have to kill him, and it's going to be over with.' " Mackey stated, " 'Okay, I'm just gonna to rob—we just gonna to rob him, just gonna to get it and go.' " Defendant heard this exchange. Thomas did not think Mackey was "serious" but acknowledged he still "felt the need to warn [Mackey] about what would happen if he did in fact shoot Mr. Gonzalez."

Once Gonzalez and another individual arrived, Thomas, Mackey, and defendant got into the backseat of Gonzalez's car. The five of them then went to a different spot, about a half a mile away, because "there was a concern about law enforcement." Once at the new location, Thomas got out of the vehicle and left, leaving Mackey and defendant in the backseat of Gonzalez's car.

About 10 minutes later, defendant called Thomas for a ride. Defendant told Thomas, " 'Mike shot him. Mike shot him,' " and then said, " 'He didn't have to shoot him.' " When the three returned to the room where they had been staying, Mackey wiped down the gun and the three split the stolen

marijuana into thirds.  Thomas took defendant back to Richmond.  Defendant took the gun with him.

Mackey testified the incident was supposed to be a "[s]natch and grab," claiming he had the gun just as "[k]ind of protection."  He said they only "vaguely" talked about the robbery, and the gun was "was supposed to be used for just protection only."  They "had no intention of shooting individuals," although he "knew it was a possibility."  He admitted he was "supposed to bring" a gun but did not do so; defendant gave him a gun.  He only shot because he thought one of the individuals "was reaching for a pistol."  By that point, defendant had already grabbed the marijuana and run.  After the shooting, Mackey ran after and caught up to defendant "within seconds."  Thomas picked them up, and Mackey gave the gun back to defendant.

Thomas's girlfriend testified she was present when Thomas, Mackey, and defendant "were talking about meeting an individual and robbing them." She saw defendant with a gun at that time, and she saw defendant give the gun to Mackey.  At some point, Thomas, Mackey, and defendant left in her car.  Thomas returned first, but got a phone call and left again.  When he returned, Mackey and defendant were with him, and they had a "large amount" of marijuana.  Thomas and defendant were asking Mackey, " 'Why would you do it?' "

Former Police Officer Mathew Meredith testified Thomas, Mackey, and defendant were arrested the day after the shooting.  Meredith met with defendant, read him his *Miranda*[4] rights, and spoke to him about the shooting.  Defendant stated his cousin, Thomas, had contacted him about "setting up . . . a lick," or a robbery, "where they were going to steal the

_____

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

9

marijuana from the victims." Thomas and defendant spoke "a couple of times" but "firmed" up plans "the day before it happened." Defendant asked Thomas if he should bring a gun, and Thomas said yes and also told defendant Mackey was coming and bringing a gun as well. On the day of the shooting, Thomas and his girlfriend picked up defendant and took him to Vallejo where they met with Mackey at a hotel to "go over . . . the plan." At that time, defendant learned Mackey did not get a weapon, and he decided to give his gun to Mackey. Defendant was supposed to grab the drugs. Thomas would not be present during the robbery because the victims knew him and would be able to identify him.

As the three drove to the apartment where they were supposed to meet the victims, they "clarified more what they were going to do." Mackey had the gun and "indicated that he might have to shoot the people" and then he and defendant "were going to then run—run through the park." Thomas was supposed to leave beforehand, get back to his car, and wait to pick them up. Thomas told Mackey, "if he shoots them he'd better kill them."

After they met the victims for the supposed purchase, Thomas introduced Mackey and defendant and then left. Mackey and defendant got into the backseat of the victims' car. The supposed deal was payment of $4,000 for the marijuana, but Mackey only had $30 or $40 on him. Defendant said Mackey "had the gun in his hand. It was out, pointed in the direction of one of the victims." Because Mackey was in the backseat, defendant "didn't believe [the victims] saw the gun." It "appeared to [defendant] Mackey was literally trying to pull the trigger, but the . . . safety was on."

When Mackey produced the money, a conversation ensued about that "not being enough money." Defendant then asked for a cigarette and got out

10

of the car to smoke it. "[A]s he got out of the car to smoke the cigarette, he knew that Mackey was psyching himself up to shoot them," so he got out, grabbed the marijuana, and "started running." As he ran, he heard gunshots, and then Mackey came "running up behind him." Defendant told Mackey "that was not called for," and he "[h]oped they weren't dead."

Thomas picked them up and took them back to the hotel. Someone wiped the gun down and handed it back to defendant. They divided the marijuana, though defendant complained he "didn't get as large of amount as the other two." Thomas gave him a ride back to Richmond with the firearm. Defendant initially told Officer Meredith he threw the gun in a nearby lake. But he later admitted that was untrue and that Mackey had given the gun back to him.

Defendant also told Officer Meredith that Mackey "had been hit in the head as a child, and I guess he was more angry than other people." Mackey had once gotten mad at defendant and had "threatened to fight him and steal his car. And the reason [defendant] was bringing that up was pointing out to me Mackey's mental state or attitude." Defendant maintained the plan "was to take the marijuana and run" and not shoot anyone but for some reason "it was in Mr. Mackey's head to shoot the people" but he "did not know why Mr. Mackey had done that."

When defense counsel asked, "there was never any plan to shoot?" Officer Meredith replied, "Well, [defendant] never planned to shoot them. He made it clear that he didn't want them to be shot. But the way he talked about—about Mackey's state of mind, he felt that Mackey was an issue." Defense counsel asked, "Well, he's talking about Mackey's state of mind when they're in the victim's car, right?" Officer Meredith, responded, "Well, he was talking about Mackey's state of mind then. And he was aware of how angry

11

Mackey was and how he acted towards himself about beating him up and stealing his car. He's aware of that. And he knows that they are going to steal the—I mean, they're going to steal the marijuana and not shoot them, yet he gives Mackey the gun, and that's the guy that he thinks is the most edgy of all of them, I guess."

The court concluded defendant was a major participant in the robbery and murder because he was involved in the planning of the crime, and he brought the firearm used to kill the victim. The court further observed "[t]he fact that there were going to be two weapons present does indicate [defendant] knew that this could be a very dangerous situation." Defendant was also present at the scene, which "meant he had the ability to facilitate or prevent the killing."

With respect to reckless indifference to human life, the court considered defendant's knowledge of the presence of the weapon, which he brought to the crime. "His proximity to the crime. He was in the vehicle right next to Mr. Mackey when Mr. Mackey first tried to shoot. Then he, I think, grabbed the property, the marijuana. And as he left, Mr. Mackey proceeded to shoot and kill the victim in this case. That means he was in a position to minimize the possibility of violence, but he did nothing other than leaving. That indicated either that he was trying to not be part of it, but could also indicate his indifference to what was going on." The court continued, "In addition to that, I think there was evidence presented at this hearing that [defendant] knew of Mr. Mackey's tendency toward violence. He had been threatened by Mr. Mackey himself, the petitioner had, in the past, [defendant] had. So I considered that as well. [¶] So not only did he bring the weapon to this crime that was eventually used to kill the victim, he gave it to an individual he knew that was violent, and there is some discussion about whether or not

12

someone would have been shot.  But it looks to me that [defendant] did act with reckless indifference to human life, in considering all that."

### *New Evidentiary Limitations*

As relevant here, Senate Bill No. 775 (2021–2022 Reg. Sess.) amended former section 1170.95 to specify what evidence may be considered in connection with a petition for resentencing.  Originally, former section 1170.95 provided that the parties could "rely on the record of conviction or offer new or additional evidence to meet their respective burdens."  (Former § 1170.95, subd. (d)(3).)  With the enactment of Senate Bill No. 775 (2021–2022 Reg. Sess.), the pertinent statutory provisions now state: "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the [trial] court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion.  However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule."  (§ 1172.6, subd. (d)(3).)

Defendant contends the new evidentiary "restrictions matter here" because they "undermine" the conclusions the court reached in denying his first petition.  Specifically, defendant points to the trial court's finding that he gave his gun to Mackey, *knowing of "Mackey's tendency toward violence. . . .* [¶]  So not only did he bring the weapon to this crime that was eventually used to kill the victim, he gave it to an individual he knew that was violent."  (Italics added.)  This, says defendant, "ran afoul of Evidence

13

Code section 1101, subdivisions (a) and (b)," which prohibit the "broad-brush use" of character evidence. Thus, while the trial court's statement "might not have been problematic prior to the enactment of [Senate Bill No. 775 (2021–2022 Reg. Sess.)]," defendant claims "such a treatment of the evidence is not consistent with the amended language of section 1172.6, subdivision (d)(3) and its emphasis on the need for resentencing hearings to comply with the Evidence Code."[5]

The record does not support defendant's assertion that Senate Bill No. 775's (2021–2022 Reg. Sess.) explicit incorporation of the rules of evidence alters the evidentiary landscape in this case.

To begin with, the transcript of the prior evidentiary hearing shows both the prosecutor and defense counsel made multiple objections to testimony. The prosecutor, in particular, made several objections based on hearsay, and the court heard argument from both counsel on those objections. Thus, the parties and the court conducted the hearing as governed by the rules of evidence, and nothing in the record suggests that had defendant objected to the now-challenged statement on Evidence Code section 1101 grounds, the court would not have ruled on the objection.

More significantly, Evidence Code section 1101 does not categorically foreclose evidence of an individual's prior criminal conduct. While "[g]enerally, the prosecution may not use a defendant's prior criminal act as evidence of a disposition to commit a charged criminal act," such evidence "is admissible 'when relevant to prove some fact (such as motive, opportunity,

---

[5] We note this is not an argument defendant advanced in the trial court in support of his second petition. Rather, defendant and the attorney supporting his request for appointment of counsel, focused on Senate Bill No. 775's (2021–2022 Reg. Sess.) reaffirmation that beyond a reasonable doubt is the proper burden of proof.

intent, preparation, plan, knowledge . . .) other than his or her disposition to commit such an act.' " (*People v. Davis* (2009) 46 Cal.4th 539, 602, citing Evid. Code, § 1101, subds. (a)–(b).)

The evidence defendant now claims is problematic was not used by the trial court for the purpose of proving Mackey's conduct on a specific occasion, the use precluded by Evidence Code section 1101. Rather, the trial court considered the evidence in assessing *defendant's* own *state of mind* and, in turn, considering his state of mind as one of the multiple factors relevant to deciding whether defendant acted with reckless indifference to human life. (See *In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*) [identifying the multiple questions that are pertinent to assessing reckless indifference to human life as set forth in *Banks* and *Clark*,[6] including "What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?"].) In short, the evidence about which defendant complains was, and is, admissible for exactly the purpose for which it was used by the trial court.

Defendant acknowledges that such use of the complained-of evidence does not run afoul of Evidence Code section 1101's propensity restriction, but maintains "any conclusion that [he] formed opinions about Mackey's propensity for violence necessarily depended on the idea that [he] was aware of facts suggesting Mackey's 'disposition to commit such an act.' " If this comment is anything other than a substantial evidence argument, which we shall discuss momentarily, we are at a loss to understand the point defendant is making. *Banks* and *Clark* clearly instruct that the defendant's "knowledge of his or her confederate's *propensity for violence*" (*Scoggins*, *supra*, 9 Cal.5th

---

[6] *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

15

at p. 677, italics added) is directly relevant to determining whether the defendant acted with willful disregard of human life.

Defendant additionally contends "there was not, in fact, any evidence presented that [defendant] knew Mackey to have a 'tendency toward violence' prior to becoming involved in the incident that led to the shooting." Defendant maintains the only evidence "even resembling a basis" for this finding is "a statement that Mackey had, on a single occasion threatened to fight [defendant]." This complaint, however, is, in substance, a substantial evidence challenge to the trial court's prior determination that defendant acted with reckless indifference to human life. It is not an argument that Senate Bill No. 775 is "new legal authority." Furthermore, it is a complaint defendant could have made, but did not make, on appeal from the denial of his prior petition following an evidentiary hearing. (See *People v. Miller, supra*, A159345.)

Even if this was an argument defendant could advance at this juncture, the evidentiary tableau with respect to Mackey involved more than Mackey "on a single occasion" threatening to fight defendant. Specifically, defendant told Officer Meredith that Mackey had once threatened to fight him and threatened to steal his car. He also told Meredith that Mackey "had been hit in the head as a child, and I guess he was more angry than other people." Defendant additionally said, "it was in Mr. Mackey's head to shoot the people" but he "did not know why Mr. Mackey had done that." The trial court additionally pointed out that despite his concerns, defendant went ahead and supplied Mackey with a gun. And even after Mackey announced he might have to shoot the victims, defendant made no effort to take his gun back. Indeed, even after seeing Mackey point at the victims and try to pull the trigger while the two were in the backset of Gonzalez's car, defendant made

16

no effort to reclaim his gun. In short, there was sufficient evidence for the trial court to consider "defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force." (*Scoggins, supra,* 9 Cal.5th at p. 677, citing *Clark, supra*, 63 Cal.4th at pp. 618–623.)

Furthermore, this one factor is not a requisite to finding a defendant acted with reckless indifference to human life (*Scoggins, supra,* 9 Cal.5th at p. 677), and there was abundant evidence, as we have recited, that the other factors identified in *Banks* and *Clark* were present.

"Did the defendant use or know that a gun would be used during the felony?" (*Scoggins, supra,* 9 Cal.5th at p. 677.) There was ample evidence supporting a "yes" answer. (See *Clark, supra,* 63 Cal.4th at p. 621 [knowledge of co-perpetrator's likelihood of killing "may be evident before the felony or may occur during the felony"].) "How many weapons were ultimately used?" (*Scoggins,* at p. 677.) As planned, there were to be two guns present during the robbery. Because Mackey failed to supply one, there was only one gun, supplied by defendant. Defendant then gave the gun to Mackey, who brandished the weapon and, after trying to fire once, successfully fired at near point blank range from the back seat of the victim's car. "Was the defendant physically present at the crime?" (*Ibid.*) Yes. "Did he or she have the opportunity to restrain the crime or aid the victim?" (*Ibid.*) Yes. Defendant not only gave Mackey his gun, but he sat next to Mackey in the backseat of the victim's car as Mackey tried to fire the weapon. "What was the duration of the interaction between the perpetrators of the felony and the victims?" (*Ibid.*) Not particularly long, but more than long enough time for Mackey to make a deliberate decision to fire the weapon. In fact, long enough for Mackey to make an unsuccessful first attempt to shoot the victims while defendant was sitting next to him in the backseat of

17

Gonzalez's car, and to then fire a second time, successfully, when defendant got out of the car, leaving Mackey with the gun. "What efforts did the defendant make to minimize the risks of violence during the felony?" (*Ibid.*) None. In short, the trial court's prior finding that defendant acted with willful disregard for human life was amply supported by the evidence.

### *Recent Youth Cases*

Defendant additionally maintains the "publication of multiple cases on the importance of evaluating youth in resentencing undermines the notion that [defendant], at age 18, acted with 'reckless indifference' while in the company of the much older shooter." (Capitalization & boldface omitted.) We would not phrase the issue in that manner, but we do agree with defendant that the recent cases specifically addressing the significance of youth factors in determining whether a defendant acted with reckless indifference to human life do represent a change in the law that appointed counsel should have an opportunity to address.

As defendant points out, a number of courts, including another division of this court, have concluded a defendant's youth is a relevant and significant factor in determining whether a criminal defendant acted with reckless indifference to human life. (*In re Moore* (2021) 68 Cal.App.5th 434, 454 [Division Three] (*Moore*) [on habeas corpus, vacating special circumstances finding]; *In re Harper* (2022) 76 Cal.App.5th 450, 453, 470 (*Harper*) [on habeas corpus, upholding special circumstances finding; agreeing youth is a consideration but disagreeing with *Moore* to the extent it suggests youth, by itself, is a *decisive* factor when the defendant was a minor at the time of the offense]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987, 1000 (*Ramirez*) [reversing denial of resentencing petition]; *People v. Harris* (2021) 60 Cal.App.5th 939, 959–961 (*Harris*) [same].)

18

The Attorney General argues the courts, including those deciding the cases cited above, have long recognized that the mental and emotional immaturity of a youthful defendant are relevant when assessing culpability. (E.g., *People v. Gutierrez* (2014) 58 Cal.4th 1354; *Miller v. Alabama* (2012) 567 U.S. 460, 476; *J.D.B. v. North Carolina* (2011) 564 U.S. 261; *Graham v. Florida* (2010) 560 U.S. 48; *Harper, supra*, 76 Cal.App.5th at p. 469–470; *Ramirez, supra*, 71 Cal.App.5th at p. 991; *Moore, supra*, 68 Cal.App.5th at pp. 453–454; *Harris, supra*, 60 Cal.App.5th at p. 960.)

While it is true the courts and our state Legislature have recognized the significant differences in the decision-making processes of adults and youth, that does not change the fact it is only very recently that the appellate courts have recognized the significance of these differences in the specific context of determining whether a youthful defendant acted with reckless indifference to human life. And in light of the Supreme Court's ruling in *Strong, supra,* 13 Cal.5th at page 716—that the high court's decisions in *Banks* and *Clark* represented a significant change in the law for purposes of the change-in-the law exception to issue preclusion—we conclude these recent appellate cases do constitute a change in the law.[7]

The Attorney General also points out that the facts of *Moore*, the case on which defendant principally relies, differ from those at hand. In *Moore*, the defendant was 16 years old at the time of the crime; defendant was 18 years old. In *Moore*, "there was no evidence [the defendant] supplied the gun." (*Moore, supra*, 68 Cal.App.5th at p. 452.) Here, defendant supplied the

---

[7] Again, we note defendant did not advance this argument in the trial court in support of his second petition. While this could be considered a forfeiture of the argument, we decline to declare a forfeiture here given the emerging significance of the consideration of youth factors in the resentencing context.

19

gun. In *Moore,* although the defendant likely saw the robbery and the shooting "while he sat in the stolen [car], he never left the car. Thus, he was not 'close enough to exercise a restraining effect on the crime or' " the shooter. (*Ibid.*) Here, defendant was in the car seated directly next to Mackey when Mackey first took aim and tried to shoot the victims, defendant, himself, then stole the marijuana as he exited the car, and upon exiting the car, defendant fully expected Mackey to shoot the victims, which Mackey did. In *Moore,* there was no evidence the defendant knew of his confederate's " 'past violent activities.' " (*Id.* at p. 453.) Here, there was evidence defendant knew about prior violent conduct by Mackey and defendant was concerned about Mackey's apparent anger.

However, that *Moore* is arguably distinguishable on its facts, skips over the threshold issue before us—whether the trial court erred in denying defendant's second resentencing petition before appointing counsel on the ground there has been no change in the law undermining the court's denial of defendant's first petition. We have concluded the court erred in that regard, and we cannot say there is no reasonable probability the court would not have summarily denied his petition at the prima facie stage had counsel been appointed and given the opportunity to address the issue.

DISPOSITION

The order denying defendant's resentencing petition is REVERSED and the matter remanded for further proceedings.

20

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Margulies, J.

A166303, People v. Miller